# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY D. BRIDGES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case number 4:06cv1200 ERW |
| | ) | TCM |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael Astrue, the Commissioner of Social Security ("Commissioner"), denying Jeffrey D.

Bridges disability insurance benefits ("DIB") under Title II of the Social Security Act ("the

Act"), 42 U.S.C. §§ 401-433. Plaintiff has filed a brief in support of his complaint; the

Commissioner has filed a brief in support of his answer. The case was referred to the

undersigned United States Magistrate Judge for a review and recommended disposition

pursuant to 28 U.S.C. § 636(b).

## Procedural History

Jeffrey D. Bridges ("Plaintiff") applied for DIB in December 2003, alleging he was

disabled as of January 2000 by Wegener's disease, stress, aches and pains, memory loss,

---

[1]Mr. Astrue was sworn in as the Commissioner of Social Security on February 12, 2007, and
is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

depression, high blood pressure, and anxiety. (R. at 48-50.)[2] This application was denied initially and after a hearing held in November 2004 before Administrative Law Judge ("ALJ") James B. Griffith. (Id. at 16-24, 29-34, 465-86.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 5-7.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff testified that he was born on September 17, 1942, and was then 62 years old. (Id. at 468.) He was 5 feet 5 inches tall and weighed 210 pounds, having gained approximately 25 pounds in the last four years because of the medication he was taking. (Id. at 468-69.) He was divorced and lived by himself in a condominium. (Id. at 469.) He had completed high school, but had no further vocational or technical training. (Id. at 470.) He had to retire in January 2000 from Anheuser-Busch because of kidney disease. (Id.) He receives a pension. (Id.)

Plaintiff had been hospitalized for two weeks in 2000 for kidney problems and had then undergone dialysis for six weeks. (Id. at 470-71.)

Asked to describe why he was unable to work, Plaintiff replied that anxiety attacks and the fatigue from his medications prevent him from doing so. (Id. at 471-72.) The anxiety attacks started in June 2000 and occur "a few times a week." (Id. at 472.) A

---

[2]References to "R." are to the administrative record filed by the Commissioner.

psychiatrist, Dr. Zia, was treating him with medication. (Id. at 472-73.) The medication calmed him down, although it usually took two hours to take effect. (Id. at 473.) He also saw Kevin Schuler for his anxiety attacks. (Id.) Plaintiff has been hospitalized four times for the attacks, with the latest being for two weeks in June or July of 2004. (Id. at 473-74.)

Plaintiff has been diagnosed with major depression. (Id. at 475.) He does not want to leave his house and does not want to do anything. (Id.) Every four or five months he has suicidal thoughts; every week he has crying spells. (Id.) He has difficulty sleeping and takes medication to help. (Id.) He goes to bed at 10:30 or 11:00 at night and, if he has taken his medication, gets up around 6. (Id. at 476.) He eats two meals a day. (Id.) His kidney problems make him go to the bathroom once an hour. (Id.) He last saw his doctor for his kidney problems one month ago. (Id. at 477.)

Plaintiff drives a car, and usually visits his sister or his son. (Id.) His sister lives close; his son does not, so he sees him once or twice a month. (Id.) He tries to visit friends or get out of the house "a few times a week." (Id. at 478.) He belongs to a church and goes to Sunday services. (Id. at 478-79.) He gets tired when he drives and goes weak in the knees sometimes when he walks farther than one-half mile. (Id. at 477, 480.) He tries to walk for exercise a few times a week. (Id. at 485.) He does not have any problems standing, stooping, or bending, but does get tired when he sits for longer than one hour. (Id. at 478, 480.) He has problems lifting things because his arms are weak. (Id. at 478.) He can lift and carry thirty to forty pounds. (Id. at 480.) He does not have any problem with his personal hygiene or changing clothes. (Id. at 479.) He does not do any outdoor activity, but

does straighten his house and keep it clean. (Id.) He does the laundry, makes the bed, shops for groceries, and does some cooking. (Id.)

For approximately six months in 2002, he ran wire for a friend who was installing television dishes. (Id. at 481.) He made approximately eight dollars an hour, working a few days each week. (Id. at 481-82.) He started doing it a couple of years ago, but did not report his earnings because he was paid in cash. (Id. at 482.) In March of this year, he flew to Florida for ten days. (Id.) In 2001, he flew to Las Vegas for four days. (Id. at 483.) He stopped playing golf six months ago because of his knees. (Id. at 484.) Once a week, he watches friends bowl; he does not bowl himself. (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his application, records from various health care providers, and reports of consultants.

On a disability report, Plaintiff stated that was 5 feet 4 inches tall and weighed 190 pounds. (Id. at 53.) His impairments first bothered him on January 28, 2000, and prevented him from working that same day. (Id. at 54.) He had worked as a beer bottler and fork lift driver from 1978 to January 2000. (Id. at 55.) This job required that he stoop and handle small objects for seven hours each workday. (Id. at 56.) The heaviest weight he frequently lifted was 35 pound cases of beer. (Id.) On a separate form, he reported that his short-term and long-term memory were gone and he forgot things. (Id. at 70.) He no longer cooks for himself because he is afraid he will leave an appliance on. (Id. at 71.) Instead, he eats out

or goes to his sister's house.  (Id.)  In May 2000, he started having difficulty sleeping and must now take a pill to sleep.  (Id.)  He does not like being around people and prefers to stay home by himself.  (Id. at 72.)  He tries to watch television or read, but he falls asleep.  (Id.)  His sister and his friend Mike remind him to do household chores.  (Id. at 73.)  His doctors told him to stop working.  (Id.)

On a pain questionnaire, Plaintiff reported that he had pain in his head three to four times a day.  (Id. at 74.)  Nothing specific caused it.  (Id.)  It was relieved by resting for one to two hours.  (Id.)  His takes medication for the pain, but it causes headaches and also results in him being dizzy, sleepy, tired, and weak.  (Id.)

After the initial denial of his DIB application, Plaintiff completed another disability report.  (Id. at 78-90.)  He reported that his anxiety attacks had increased after May 2004.  (Id. at 78.)  He was taking alprazolam and Celexa for depression; Ambien to help him sleep; and Cozaar and Risperdal for his high blood pressure.  (Id. at 80.)  Each had been prescribed by Dr. Zia.  (Id.)  At the time of the hearing, he was taking Ambien, Effexor and lorazepam for depression, Zetia and Pravachol for high cholesterol, and Abilify, a tranquilizer, for anxiety.  (Id. at 91.)

Plaintiff's relevant medical records[3] before the ALJ begin in February 2000.

_____

[3]Plaintiff's medical records also include records relating to illnesses or conditions which were not cited as a basis for his alleged disability, for instance, records relating to prostrate problems in 1999, (id. at 92, 230-31), a swollen right ankle and leg in 1999, (id. at 93-97, 230), pain in 2000 his right jaw (id. at 103), excessive ear wax in 2000, (id. at 225-26), and erectile dysfunction in 2001, (id. at 223).

Plaintiff consulted his primary care physician, Kenneth C. Kreski, M.D., on February 2 about complaints of joint aches. (Id. at 226.) He had no chest pains, headaches, or blurred vision. (Id.) His energy level was appropriate. (Id.) Arthritis was suspected. (Id.) He was referred to Henry E. Purcell, M.D. (Id.)

 Dr. Purcell saw Plaintiff the next day. (Id. at 356-57.) He reported that he had a red and painful rash on his legs and also had pain in his knees, hands, and elbows. (Id. at 356.)

On February 4, Plaintiff was admitted to St. Mary's Medical Center ("St. Mary's") for acute renal failure. (Id. at 107- 22.) He was treated during his five-day hospital stay with prednisone and dialysis. (Id. at 108.) Because he had experienced anxiety attacks when taking prednisone in the past, he was referred to J. Paul Rutledge, M.D., for assistance with the psychological side effects. (Id.) Plaintiff also had some abdominal pain, which was treated with Prevacid. (Id.) While hospitalized, Plaintiff's complaints of chest pain were investigated. (Id. at 116, 118.) A thallium stress test revealed normal myocardial perfusion and no evidence of ischemia or infarction. (Id. at 116, 118, 227-28.) A chest x-ray was also normal. (Id. at 119.) He was discharged with a catheter in place and instructed to get dialysis on an out-patient basis. (Id. at 108.)

Plaintiff reported to Dr. Purcell at an office visit on February 17 that he was following his diet, had no abdominal pain or swelling, and was walking on a treadmill. (Id. at 355.) At his follow-up visit twelve days later, Plaintiff reported that he was walking everyday. (Id. at 350.) He had mood swings and could not sleep. (Id.) He was released for golf and swimming. (Id.)

He was again admitted to St. Mary's on March 13 with complaints of rapid ventricular response, gastroenteritis, and mood swings. (Id. at 123-40.) It was noted that he had Wegener's granulomatosis[4] ("Wegener's"). (Id. at 124.) It was further noted that he was on prednisone and an immunosuppressive drug, Cytoxan, but was no longer on dialysis. (Id.) His 85-year old mother had hypertension, dementia, diabetes, and a history of cancer. (Id. at 125.) His father had died at the age of 68 of a myocardial infarction. (Id.) When admitted, Plaintiff was weak, had daily diarrhea, and had a tremor at rest, but denied, among other things, chest pain, palpations, joint or muscle aches, and abdominal pain. (Id.) On examination, he was alert and oriented to person, place, and time, had a slight stutter, and had a slight tremor in his medial thigh. (Id.) A consulting physician noted that Plaintiff reported having difficulty with forgetfulness since he had been on steroids. (Id. at 130.) He also had increasing insomnia and hypomanic symptoms. (Id.) It was thought he might have early Parkinson's disease. (Id. at 132.) Another consulting physician noted that Plaintiff's father had died at the age of 59 of a myocardial infarction. (Id. at 134.) That physician concluded that Plaintiff had not had a myocardial infarction. (Id.) On discharge the following day, Plaintiff was told to stop taking the Cytoxan, continue taking the prednisone, and start following a regular diet. (Id. at 127.) He had no restrictions on activity. (Id.) The discharge diagnosis was diarrhea due to viral gastroenteritis and mania due to steroids. (Id.)

---

[4]Wegener's granulomatosis "is an uncommon disorder that causes inflammation in blood vessels (vasculitis), which restricts blood flow to various organs[,]" most commonly the "kidneys, lungs and upper respiratory tract[.]" Mayo Clinic, http://www.mayoclinic.com/health/wegeners-granulomatosis/DS00833/DSECTION=1 (last visited July 18, 2007) (alterations added). The disease progresses quickly. Id. at SECTION=5.

On March 21, Plaintiff consulted Dr. Purcell about a sore throat and stuffy nose. (Id. at 345-47.) His irritability was "not bad." (Id. at 345.) The following week, he still had a sore throat. (Id. at 344.)

On March 28, Plaintiff was admitted to St. Mary's with complaints of severe anemia. (Id. at 141-57.) Plaintiff's main symptoms were fatigue and upper respiratory symptoms. (Id. at 146.) Plaintiff denied having headaches, except when he also had a fever, or trouble swallowing. (Id.) A consulting physician noted that he would soon retire as a truck driver. (Id.) He had not had "any exotic travels," but did occasionally travel to Florida. (Id.) He had two cats and fish at home. (Id.) Recently, he had swelling in his legs and had been on an antibiotic, Ceftin. (Id. at 147.) His blood sugar was elevated and he was being treated with sliding scale insulin. (Id. at 146.) His anemia was treated with infusions. (Id. at 150.) His white blood cell count remained low, however, so a consulting physician anticipated doing a bone marrow biopsy. (Id. at 154.) Another consulting physician noted that the Zyprexa and Ativan prescribed by Dr. Rutledge had controlled the steroid-induced mania "pretty well." (Id. at 155.) In addition to the previous diagnosis of Wegener's, Plaintiff was diagnosed by Dr. Purcell with leukopenia (a low white blood cell count), anemia, mild hypotension (low blood pressure), high glucose, and steroid hypomania. (Id. at 156-57.)

Plaintiff reported to Dr. Purcell on April 17 that he was feeling okay, but was a "bit testy at times." (Id. at 341.) His wife described him as irritable and "quite difficult." (Id.) Dr. Purcell was concerned about Plaintiff's diabetes and told him to get back on the diet.

(Id.)  The next day, Dr. Kreski referred Plaintiff to Dr. Dobmeyer for evaluation of his tremors.  (Id. at 225.)

Following a visit on April 24, Dr. Purcell wrote Dr. Kreski on May 15 to report that Plaintiff was doing well.  (Id. at 335, 339.)  Specifically, his creatinine levels were at the lowest they had been, his electrolytes "were in good shape," his nerves were "more together," and he was being weaned off the prednisone.  (Id. at 335.)

On May 26, Plaintiff's wife called Dr. Purcell and reported that he was very depressed, stayed in bed, and had no energy.  (Id. at 332.)  She wanted to give him a vitamin B12 injection.[5]  (Id.)

On June 5, Plaintiff was admitted to the hospital with complaints of generalized weakness, anxiety, and depression.  (Id. at 158-69.)  Originally, he was to be admitted to the psychiatric unit; however, it was doubtful whether his insurance would approve the stay so he was admitted to the medical unit.  (Id. at 165.)  He reported that his wife had gone on a spending spree that he did not think he would financially recover from.  (Id. at 163, 165.)  His family reported that he had become weak and very depressed because of his wife's spending habits and the conflicts between her and his son and other family members.  (Id. at 165.)  Dr. Purcell noted on the admission record that Plaintiff had been scheduled to see him to further be weaned from the prednisone but had elected to go golfing with his friends instead.  (Id.)  The appointment had been rescheduled for June 6.  (Id. at 165.)  Because he

_____

[5]Plaintiff's wife apparently owned or operated a vitamin store; he attributed her ruining his finances to this.

and his wife had both been seeing Dr. Rutledge – she did all the talking – he was referred to Adam J. Sky, M.D.  (Id. at 163, 165.)  Plaintiff had recently retired from Anheuser-Busch. (Id.)  On examination, he was alert and oriented to person, place, and time.  (Id.)  His affect was "very depressed and flat."  (Id.)  He had thoughts of wanting to die, but not of suicide. (Id. at 164.)  Dr. Sky diagnosed him with major depression, moderate to severe, single episode.[6]  (Id.)  He wanted to eliminate steroid psychosis so determined that certain medications, including steroids, should be discontinued and others, including citalopram, a generic antidepressant, be increased.  (Id.)  Dr. Purcell also wanted to stop "just about" all Plaintiff's medications, leaving him only on Cytoxan, Prevacid, and Celexa, a brand name for citalopram.  (Id. at 167.)  Two days after admission, Plaintiff was discharged to stay with his siblings and son.  (Id. at 159.)

Three days after his discharge, Plaintiff was admitted to the psychiatric unit of St. Anthony's Medical Center ("St. Anthony's") for treatment of major depression under the care of Rashid Zia, M.D..  (Id. at 170-90, 329-31.)  He reported having death wishes but was

---

[6]Major depression, single episode, is diagnosed when an individual has a single episode with five or more of the following symptoms present during the same two-week period: (1) a "depressed mood most of the day, nearly every day, as indicated by either subjective report (e.g., feels sad or empty) or observation made by others (e.g., appears tearful)"; (2) a "markedly diminished interest or pleasure in all, or almost all, activities most the day, nearly every day"; (3) "significant weight loss when not dieting"; (4) "insomnia or hypersomnia nearly every day"; (5) "psychomotor agitation or retardation nearly every day"; (6) "fatigue or loss of energy nearly every day"; (7) "feelings of worthlessness or excessive or inappropriate guilt . . . nearly every day"; (8) diminished ability to think or concentrate, or indecisiveness, nearly every day"; and (9) recurrent thoughts of death . . . recurrent suicidal ideation without a specific plan . . ."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders – Text Revision, 356 (4th Text Rev. 2000) ("Diagnostic Manual").  The first or second symptom must be present.  Id.

ambivalent about suicide.  (Id. at 188.)  He had just retired from his job as a bottler with

Anheuser-Busch on May 31 and had recently "bought a lot of stuff, RV, etc., and incurred

a lot of expenses."  (Id. at 185, 188.)  His wife was on disability for back problems.  (Id. at

188.)  She had high credit card bills, had cashed Plaintiff's stock, and had taken a second

mortgage on their house.  (Id. at 187.)  Plaintiff had asked his son for financial help; his wife

had tried to get a restraining order against the son.  (Id.)  On examination, Plaintiff seemed

"hopeless and helpless."  (Id. at 188.)  He could not concentrate.  (Id.)  His mood was sad;

his affect was flat; his speech was slow and monotonous.  (Id.)  He did not want to talk, and

had "significantly decreased psychomotor activity."  (Id.)  His "memory of the most recent

and immediate events [was] within normal limits."  (Id.)  The diagnosis was major

depression, recurrent.[7]  (Id. at 189.)  The estimated length of stay was three to five days.

(Id.)  For four days of his stay, Plaintiff was convinced that he was going to soon die.  (Id.

at 174-82.)  At one point, electroconvulsive therapy ("ECT") was discussed with Plaintiff

and his family; it was refused.  (Id. at 178-80.)  After a week's treatment with individual and

group therapy and psychotropic medications, including Wellbutrin, Plaintiff was discharged

on June 17.  (Id. at 170.)  He was then taking Prevacid, Paxil (an antidepressant), Restoril,

and Risperdal.  (Id.)  He was also given a seven-day supply of Vantin, an antibiotic.  (Id.)

_____

[7]Major depression, recurrent, is diagnosed when two or more major depression episodes are present, see note 6, supra. Diagnostic Manual at 345.  "An episode is considered to have ended when full criteria for Major Depressive Episode [see note 6, supra] have not been met for at least 2 consecutive months."  Diagnostic Manual at 369.  "During this 2-month period, there's either complete resolution of symptoms or the presence of depressive symptoms that no longer meet the full criteria for a Major Depressive Episode . . . ."  Id.

Three days after being discharged, Plaintiff reported to Dr. Purcell that he was feeling okay. (<u>Id.</u> at 326.) His drooling was worse; his ear was better. (<u>Id.</u>) He was alert and oriented to person, place, and time. (<u>Id.</u>) Dr. Purcell had a long discussion with Plaintiff, who was, in Dr. Purcell's opinion, depressed. (<u>Id.</u>) Plaintiff was to start a day program with Dr. Zia soon. (<u>Id.</u>)

The next day, Plaintiff was admitted again to St. Anthony's. (<u>Id.</u> at 191-200, 203.) He reported that his wife had taken $250,000 from his retirement account; he had filed for divorce. (<u>Id.</u> at 191.) With group therapy, Plaintiff became more talkative and his mood, eating, and sleeping improved. (<u>Id.</u>) On July 3, he was described as having a fair affect and improved mood. (<u>Id.</u> at 193.) He was socializing more and was taking his medications. (<u>Id.</u>) He was ready to be discharged. (<u>Id.</u>) After discharge on July 5, he was to follow up with Dr. Zia and with Kevin Schuler, Ph.D., a psychologist. (<u>Id.</u> at 191.)

On July 20, Plaintiff returned to Dr. Purcell's office with complaints of swollen feet and hands and of drooling. (<u>Id.</u> at 324.) His spirits were better. (<u>Id.</u>) He was to stay on the prescribed dosage of Cytoxan. (<u>Id.</u>)

On August 8, Plaintiff was seen by Dr. Zia. (<u>Id.</u> at 428.) His mother had died; he was getting a divorce. (<u>Id.</u>) His sleep was poor and he was tired all the time. (<u>Id.</u>) He did not talk of dying. (<u>Id.</u>)

Dr. Purcell examined Plaintiff on August 10. (<u>Id.</u> at 317-23.) Plaintiff complained of swelling in his ankles and hands and wanted to reduce his dosage of Cytoxan. (<u>Id.</u> at

317.) Although he reported feeling "fine," Dr. Purcell described him as having very little eye contact and being depressed. (Id.) Plaintiff had a skin rash that came and went. (Id.)

Two weeks later, on August 23, Plaintiff was again admitted to St. Mary's for renal failure. (Id. at 207-20.) On admission, Dr. Purcell noted Plaintiff's recent history of hospital admissions, the tension between managing his Wegener's with steroids and treating his steroid-enhanced psychiatric difficulties, the improvement in his depression after his recent psychiatric admission and being weaned off the steroids, and the recent control of his Wegener's. (Id. at 218.) Recently, however, his creatinine levels – indicative of a flare-up of his Wegener's – were up and his white blood cell counts were low. (Id.) On examination, Plaintiff reported that he was not coughing or short of breath and he had no chest pain, back pain, nausea, or vomiting. (Id. at 219.) His "[m]ental status [was] fine." (Id.) His depression was better – he was on psychiatric medication – and he was eating better and socializing more. (Id.) He was getting a divorce. (Id.) He was admitted for a work-up to determine the cause of his acute renal failure. (Id. at 220.) Dr. Sky was to be called in for a consult in case the resumption of steroids caused psychiatric problems. (Id.)

Dr. Sky saw Plaintiff the next day. (Id. at 216-17.) Plaintiff reported to him that he was constantly depressed and anxious; specifically, he had trouble concentrating and sleeping. (Id. at 216.) He was upset about his impending divorce. (Id.) On examination, he was alert and oriented to person, place, and date. (Id. at 217.) His speech was "elicitable, directable, but limited." (Id.) His affect and mood were "rather blunted." (Id.) He had no hallucinations, delusions, or gross psychotic symptoms. (Id.) Dr. Sky diagnosed him with

depression and anxiety and continued him on his current psychiatric medications. (<u>Id.</u>) He also decided to continue him on alprazolam, a benzodiazepine,[8] with a note that the dosage could be increased if Plaintiff became agitated or psychotic when treated with steroids. (<u>Id.</u>)

A rheumatologist, John J. Budd III, M.D., also examined Plaintiff. (<u>Id.</u> at 213-15.) Plaintiff informed him that he had had joint pains in the past, but currently had only pain in his left elbow. (<u>Id.</u> at 213.) Also, he was stiff in the morning for no longer than 30 minutes. (<u>Id.</u>) On examination, he was not in acute distress from pain but was depressed. (<u>Id.</u> at 214.) He had no edema in his lower extremities, but his hands "were mildly puffy." (<u>Id.</u>) His joints were neither tender nor swollen. (<u>Id.</u>) His elbows had a good range of motion, and his left elbow was not tender over the joints. (<u>Id.</u>) "[He] did have some tenderness over the lateral epicondyle on the left[,]" and a decreased range of motion in his shoulders with external rotation. (<u>Id.</u>) Dr. Budd suspected that his renal failure may have been caused by the addition of a sulfa preparation and opined that his Cytoxan should be continued if the renal biopsy was consistent with Wegener's or with worsened Wegener's. (<u>Id.</u>) A chest x-ray was normal. (<u>Id.</u> at 211.) A renal biopsy showed interstitial nephritis consistent with use of sulfa. (<u>Id.</u> at 208-10.) It did not show active Wegener's. (<u>Id.</u> at 208.) The sulfa preparation, Bactrim, was discontinued. (<u>Id.</u>) Plaintiff improved on a short course of steroids and was discharged on August 27 with instructions to taper off the prednisone. (<u>Id.</u>)

---

[8]Benzodiazepines are "[a] class of compounds with antianxiety, hypnotic, anticonvulsant, and skeletal muscle relaxant properties." <u>Stedman's Medical Dictionary</u>, 198 (27th ed. 2000).

On his September 15 visit to Dr. Purcell, Plaintiff reported feeling okay and not overly nervous. (Id. at 312.) He had finished the cycle of prednisone the previous Saturday. (Id.) His Wegener's was in remission. (Id.)

Plaintiff saw Dr. Zia again on October 6. (Id. at 427.) His mood and affect were poor. (Id.)

On October 17, Dr. Purcell described Plaintiff as being nervous, but better than he was during the summer. (Id. at 309.) He had not seen Dr. Budd. (Id.)

Plaintiff reported to Dr. Zia on November 6 that Xanax was helping. (Id. at 426.) He was sleeping okay and his appetite was fair. (Id.) Ten days later, Plaintiff reported to Dr. Purcell that he felt okay. (Id. at 308.) He had had a rash, but it was better. (Id.)

On January 4, 2001, Plaintiff complained of a cough, runny nose, and nasal congestion. (Id. at 307.) He was in the process of a divorce. (Id.) Plaintiff informed Dr. Zia on January 16 that he was back in the house, alone. (Id. at 426.) He felt tired and run down; however, his appetite and mood were fair. (Id.) He did feel anxious. (Id.) He was not taking Xanax. (Id.) Plaintiff told Dr. Purcell in February that he felt well but was not sleeping well. (Id. at 306.) He wanted to work at Grant's Farm. (Id.)

Dr. Zia described Plaintiff at his March visit as being pleasant and alert and oriented to person, place, and time. (Id. at 425.) His appetite was okay; his sleep was not. (Id.) Physically he was okay; he played golf and bowled. (Id.)

Also in March, Dr. Purcell noted on Plaintiff's laboratory reports that he had low back pain. (<u>Id.</u> at 301.) Two days later, Plaintiff consulted Dr. Kreski for complaints of lower back discomfort that had begun a few weeks before after sleeping on a couch. (<u>Id.</u> at 223.)

Plaintiff told Dr. Purcell in April that he was not sleeping very well. (<u>Id.</u> at 300.) A note was made that caution had to be exercised with his medications because of his depression. (<u>Id.</u>) He was to be weaned gradually from Cytoxan. (<u>Id.</u>) His anemia would probably improve. (<u>Id.</u>)

In June, Plaintiff reported feeling a little tired as a result of a medication he was taking. (<u>Id.</u> at 296.) A few weeks later, he saw Dr. Zia and reported that he had decreased the amount of Paxil he was taking and his depression had worsened. (<u>Id.</u> at 424.) He had then increased the dosage of Paxil, but had had no relief. (<u>Id.</u>) He appeared anxious. (<u>Id.</u>) He was asked to see Dr. Schuler; his response was ambivalent. (<u>Id.</u>) He saw Dr. Zia again in July, but continued to have low energy and to be depressed and tired. (<u>Id.</u> at 423.) He was going to see Dr. Schuler. (<u>Id.</u>)

At his August visit to Dr. Purcell, Plaintiff was feeling okay. (<u>Id.</u> at 292.) His Wegener's was in partial remission. (<u>Id.</u>) At his August visit to Dr. Zia, Plaintiff was alert and oriented and pleasant. (<u>Id.</u> at 422.) His mood and affect were better. (<u>Id.</u>) He had met a woman at his fortieth high school reunion and had been to Las Vegas. (<u>Id.</u>)

Plaintiff reported to Dr. Purcell in November that he was divorced, taking Paxil, and feeling better. (<u>Id.</u> at 288.) His spirits and affect were better. (<u>Id.</u>)

At his first visit to Dr. Purcell in 2002, on January 7, Plaintiff reported being depressed over the holidays. (Id. at 285.) He was not suicidal. (Id.) In March, Plaintiff told Dr. Purcell that he was getting out more and was feeling well. (Id. at 281.) Subsequently, Dr. Purcell wrote Dr. Kreski that Plaintiff's Wegener's was in remission and his creatinine levels were stable. (Id. at 340.) A repeat renal biopsy had shown no activity of the Wegener's. (Id.) Additionally,

> [h]is hemoglobin has been good. He's just taking iron for this. He's feeling well. He's getting out more. He's even been dating since his divorce and his spirits are much better. His blood pressure is 132/70, his respiratory rate is 20, his pulse 80 and his skin is warm and dry. His lungs are clear, his heart is regular, his abdomen is soft and his extremities show no edema. He's doing well. . . .

(Id.)

In the winter of 2002,[9] Plaintiff reported to Dr. Zia that he had filed for bankruptcy and was divorced in September 2001. (Id. at 421.) He was taking Paxil and Xanax. (Id.) He was sleeping okay; however, his mood and affect were irritable. (Id.) He was described as being non-complaint with medications and therapy. (Id.) He did "not follow directions at all." (Id.) At his next, March visit, Plaintiff reported that he was doing okay. (Id. at 420.) He was getting out of the house every day and walking. (Id.) He was thinking of getting a part-time job as a courier. (Id.)

At his next follow-up visit to Dr. Purcell, in May, Plaintiff was feeling okay. (Id. at 280.) His depression was better. (Id.) He had seen Dr. Hardy, and had a positive report.

---

[9]The month is illegible, however, the record is dated "2002" and is before the March visit.

(Id.)  At his next visit to Dr. Purcell, in June, Plaintiff continued to report that he was feeling well.  (Id. at 276.)  He was leaving for Las Vegas in a few days.  (Id.)  Shortly after this visit, Plaintiff saw Dr. Zia.  (Id. at 419.)  He reported feeling and sleeping "well."  (Id.)  He wanted to decrease his medications.  (Id.)

Plaintiff telephoned Dr. Purcell's office the next month with complaints of a headache, sore throat, cough, and congested chest.  (Id. at 275.)  He was prescribed an antibiotic.  (Id.)  Plaintiff reported at his August visit that he felt tired all the time.  (Id. at 272.)  His creatinine levels were stable.  (Id.)  At his next visit, in October, Plaintiff's ankles were swollen.  (Id. at 268.)  His blood pressure was higher; a new medication was added.  (Id.)

Sometime in the autumn,[10] Plaintiff returned to Dr. Zia.  (Id. at 418.)  He felt tired and bored.  (Id. at 418.)  An increase in his dosage of Paxil was causing fatigue.  (Id.)  His mood was irritable; his affect was worried.  (Id.)

Plaintiff reported having no problems with depression at his November visit.  (Id. at 266.)  He had no edema and his lungs were clear.  (Id.)  He felt okay.  (Id.)  At his December visit, Plaintiff was feeling well; his Wegener's was stable.  (Id. at 263.)  Plaintiff also reported to Dr. Zia in December that he felt well and was not depressed.  (Id. at 417.)  His energy, mood, and affect were all better.  (Id.)  He was to work part time.  (Id.)

At his follow-up visit to Dr. Purcell in January 2003, Plaintiff had no rash and no edema.  (Id. at 261.)  His depression was okay.  (Id.)  His blood work was stable.  (Id. at

---

[10]Again, the month is illegible, see note 7, supra; however, the visit was between June and December.

262.)  In February, Plaintiff was described as being "[a] bit depressed lately."  (<u>Id.</u> at 257.)

He had not had a reoccurrence of Wegener's.  (<u>Id.</u>)  Plaintiff reported to Dr. Zia the same

month that his depression had increased during the past month.  (<u>Id.</u> at 416.)  His energy

level was low; his motivation was decreased.  (<u>Id.</u>)  He was withdrawn socially.  (<u>Id.</u>)  The

following month, Plaintiff's mood and affect were low.  (<u>Id.</u> at 415.)  He reported feeling

overwhelmed and hopeless.  (<u>Id.</u>)

Plaintiff's depression led to his admission to St. Anthony's on April 4 to a partial

program.  (<u>Id.</u> at 379, 391-92.)  He was worried about his finances and thought he would

have to sell his house to pay back taxes.  (<u>Id.</u> at 379.)  He had had to declare bankruptcy.  (<u>Id.</u>

at 391.)  He had become increasingly depressed during the past several months.  (<u>Id.</u> at 379.)

He had no motivation or energy and was isolative and withdrawn.  (<u>Id.</u>)  He wished he was

dead, but had no thoughts of suicide.  (<u>Id.</u>)  To a nurse, he described his biggest problem as

feeling bored and lonely.  (<u>Id.</u> at 390.)  To another nurse, he reported that his finances were

his main problem.  (<u>Id.</u>)  A woman he had lived with for five months had recently moved out,

and he was very lonely.  (<u>Id.</u> at 389.)  He reported having too much unstructured time and

needed to work.  (<u>Id.</u>)  The admitting psychiatrist, Dr. Zia, noted that Plaintiff was not

responding to the outpatient program.  (<u>Id.</u> at 391.)  His medical history included a previous

psychiatric hospitalization in 1996, in addition to the one in 2000.  (<u>Id.</u>)  On examination,

Plaintiff's mood was sad and anxious; his affect was constricted.  (<u>Id.</u>)  His speech was

coherent; his flow of thought was normal.  (<u>Id.</u>)  His memory, both of remote and recent

events, and his intellectual functioning were within normal limits.  (<u>Id.</u>)  His insight and

judgment were good.  (Id.)  The admitting diagnosis was major depression, recurrent and severe, and his Global Assessment of Functioning ("GAF") was 45.[11]  (Id.)

A few days after his admission, Plaintiff's son informed the nurse that he had worked out some of his father's financial details and things were not as bleak as his father thought.  (Id. at 386.)  Regardless, Plaintiff's mood was low, and he worried constantly.  (Id.)  Two days later, Plaintiff continued to be anxious, tense, and passive.  (Id.)  Later that same day, he felt better; his mood and appetite were better.  (Id.)  Three days later, on April 17, Plaintiff continued to have low motivation, although his mood was better.  (Id. at 384.)  On April 21, Plaintiff reported that his sleep was fair and his appetite was good.  (Id. at 382.)  He was nervous in the morning.  (Id.)  He was discharged from the program that day.  (Id. at 379.)  He was to see Dr. Zia the next month and Kevin Schuler, Ph.D., in two days.  (Id. at 380.)

When Plaintiff returned to Dr. Purcell's office, in May, his Wegener's was in partial remission.  (Id. at 254.)  In June, Plaintiff reported that his ankles were swollen since he had switched from one medication to another.  (Id. at 251.)  His medications were changed accordingly.  (Id.)  At a follow-up visit in August, Plaintiff reported feeling okay.  (Id. at

---

[11]"According to the [Diagnostic Manual], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).  See also **Bridges v. Massanari**, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)).  A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Diagnostic Manual at 34.

250.)  His cholesterol levels were high; his Lipitor dosage was increased.  (<u>Id.</u> at 250, 253.)
When Plaintiff saw Dr. Purcell in September, his Wegener's was again described as being
in partial remission.  (<u>Id.</u> at 245.)  He had no skin rash, no urinary problems, and no edema.
(<u>Id.</u>)  He felt okay.  (<u>Id.</u>)

Sometime between March and October,[12] Plaintiff saw Dr. Zia, reporting that he had
a two-week old grandchild.  (<u>Id.</u> at 413.)  He was sleeping well and his appetite was good.
(<u>Id.</u>)  At an October visit, his mood and affect were again low.  (<u>Id.</u> at 412.)  He worried a
lot.  (<u>Id.</u>)  He was not walking.  (<u>Id.</u>)  Dr. Zia referred him to Dr. Schuler.  (<u>Id.</u>)

His blood work in November indicated that his Wegener's was stable.  (<u>Id.</u> at 244.)

On December 8, Plaintiff reported at a follow-up visit to Dr. Purcell that he was
feeling good.  (<u>Id.</u> at 237.)  He had sold his house and moved into a condominium.  (<u>Id.</u>)  He
had been on Lipitor for three months.  (<u>Id.</u>)

Plaintiff reported his move also to Dr. Zia when he saw him on January 9, 2004.  (<u>Id.</u>
at 411.)  He was described as being very confident.  (<u>Id.</u>)  He wanted to stop taking Risperdal
and Effexor.  (<u>Id.</u>)

Plaintiff saw Dr. Purcell again on January 12.  (<u>Id.</u> at 234.)  He reported feeling okay.
(<u>Id.</u>)  His renal counts were stable; his Wegener's was in remission.  (<u>Id.</u>)

Sometime between January and June,[13] Plaintiff told Dr. Zia that he had episodes of
anger.  (<u>Id.</u> at 410.)  His mood was tense and anxious.  (<u>Id.</u>)  He and a girlfriend had recently

---

[12]The month is illegible.

[13]The month is illegible.

gone to Florida for twelve days.  (Id.)  His disability evaluation was scheduled for the next day.  (Id.)  In June, Plaintiff appeared "very" anxious.  (Id. at 409.)  His concentration was impaired, although his thought process was within normal limits.  (Id.)  He did not want to do anything.  (Id.)  The next month, Plaintiff continued to be anxious.  (Id. at 408.)  He was sad and afraid to be alone.  (Id.)

Shortly after his July visit to Dr. Zia, Plaintiff was voluntarily admitted to St. John's Mercy Medical Center for depression.  (Id. at 434-41.)  His current medications were Cozaar, Effexor twice a day, Xanax four times a day, Ambien, and Risperdal four times a day.  (Id. at 439.)  The admitting psychiatrist, Eduardo L. Garcia-Ferrer, M.D., described Plaintiff as increasingly depressed, with a history of failed outpatient treatment, and "positive hopelessness."  (Id. at 437.)  He denied any suicidal or homicidal ideation or intent.  (Id.)  Dr. Garcia-Ferrer discontinued the Risperdal and started Plaintiff on Abilify, thinking that the latter might help better with Plaintiff's anxiety and agitation.  (Id.)  He assessed Plaintiff's current GAF as 50[14] and his GAF during the past year at 60.[15]  (Id.)

On discharge six days later, Plaintiff's GAF was 55.  (Id. at 435.)  He was diagnosed with major depressive disorder, recurrent, and anxiety disorder.  (Id.)  His Xanax had been switched to Ativan.  (Id.)  He was feeling better and no longer afraid that he was going to die,

---

[14]See note 9, supra.

[15]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Diagnostic Manual at 34 (alteration added).

as he had been before.  (Id.)  He was to follow up with an intensive outpatient program to begin the next day.  (Id. at 436.)   Plaintiff enrolled in such program two days later.  (Id. at 458-59.)

On September 21, Plaintiff again saw Dr. Garcia-Ferrer.  (Id. at 451-52.)  He reported that he was doing well and had no complaints.  (Id. at 451.)  His mood was good; his affect was euthymic; his thought was logical; and his speech was normal.  (Id.)  Plaintiff was seeing Dr. Schuler twice a week for psychotherapy.  (Id. at 452.)

In addition to the records of Plaintiff's treatment by various health care providers, the ALJ also had before him the reports of various consulting and treating providers.

Reports of his treating providers are as follows.

In January 2004, Dr. Purcell replied to a questionnaire sent him by a counselor with the Section of Disability Determinations for the State of Missouri.  (Id. at 233.)  Plaintiff's diagnosis was Wegener's.  (Id.)  Dr. Purcell had first seen him in February 2000 and last seen him the day before.  (Id.)  Plaintiff was compliant with his medications, which had side effects of fatigue.  (Id.)  Asked to describe any work-related limitations, Dr. Purcell replied, "fatigue."  (Id.)

In February, Dr. Schuler wrote the counselor that he had had 22 psychotherapy sessions with Plaintiff from July 14, 2000, to June 10, 2003, inclusive.  (Id. at 358.)  Seventeen sessions were in 2001; five were in 2003.  (Id.)  None were in 2002.  (Id.)  Dr. Schuler reported that:

> [Plaintiff] presented with a severe depression marked by chronic suicidal ideas, sleep disruption, low energy, no motivation, no initiative, concentration impairment, repetitive, obsessive thoughts about not having a reason to live, preoccupation with his physical illnesses, feelings of hopelessness and helplessness. He would make temporary improvements and seemed intent on overcoming the depression. However, the depression repeatedly came back and appeared to break his spirit. He was faithful about making his appointments but felt frustrated that treatment resulted in little improvement. Psychoactive medications and hospitalizations were also part of his treatment.

(Id.) Dr. Schuler diagnosed Plaintiff with major depressive disorder, recurrent and severe without psychotic features.[16] He opined that Plaintiff's depression was disabling. (Id.)

Plaintiff's attorney submitted an August 2004 report of Dr. Schuler. (Id. at 443-44.) Dr. Schuler had resumed treating Plaintiff in June 2004 and had had four sessions with him. (Id. at 443.) He noted that:

> Jerry presents with symptoms of a severe depression including suicidal ideas and preoccupation, no energy, no initiative, severe concentration disruption, social isolation, sleep impairment, sadness and dysphoria, fearfulness and anxiety. His current depression is similar to depressions he has experienced on a cyclical, regular basis over the past five years.
>
> . . . Jerry expresses interest in getting work, either paying work or volunteer work. However, he does not have the concentration abilities or focus, the energy or initiative, and most importantly the mood stability to secure and stay with a job. Medication, hospitalization and talk therapy have all been attempted and continue to be used in addressing his psychiatric illness. However, multiple treatments have only managed to partially stabilize his treatment. . . . [H]e has been experiencing a debilitating psychiatric illness that has prevented him from pursuing or succeeding at any work adjustment. . . .

---

[16]The code for this disorder is 296.33. Dr. Schuler listed this code for his diagnosis. "Severe without psychotic features" means that the major depressive episodes are "characterized by the presence of most of the criteria symptoms [see note 6, supra] and clear-cut, observable disability (e.g., inability to work or care . . .)." Diagnostic Manual at 412.

(Id.)  Dr. Schuler assessed Plaintiff's current GAF as 40/45.[17]  (Id. at 444.)

The next month, Dr. Garcia-Ferrer completed a Mental Residual Functional Capacity Questionnaire.  (Id. at 446-50.)  Of twenty-five listed mental activities related to the ability to function on a day-to-day basis in a regular work setting, Plaintiff was assessed as being unable to meet competitive standards in all but five activities.  (Id. at 448-49.)  He was assessed as being seriously limited, but not precluded, in those five: his ability to (1) carry out very short and simple instructions; (2) ask simple questions or request assistance; (3) adhere to basic standards of neatness and cleanliness; (4) travel in unfamiliar places; and (5) use public transportation.  (Id.)  Plaintiff was not a malinger.  (Id. at 450.)  His mental impairments would cause him to be absent from work more than four days each month.  (Id.)  Moreover, his impairments were "reasonably consistent" with the described symptoms and functional limitations.  (Id.)

The reports of consulting providers are as follows.

Plaintiff was examined by a consulting psychologist, James D. Reid, Ph.D., in March 2004.  (Id. at 401-06.)  He reported that he had to retire early because of kidney failure secondary to Wegener's disease.  (Id. at 402.)  His mother had died in 1995, his father in 1983.  (Id.)  He had a driving while intoxicated charge in 1980, but had "'pretty much stopped'" drinking because of his kidney problems.  (Id.)  He did not smoke.  (Id.)  On examination, his attitude was pleasant and cooperative.  (Id.)  His motor activity, posture, gait, mannerisms, eye contact, insight, and judgment were all within normal limits.  (Id. at

_____

[17]See note 9, supra.

402, 403.) His speech was coherent, relevant, and logical. (Id. at 402.) He filled any silence with "verbal utterances." (Id. at 402, 403.) He was also cooperative. (Id. at 402.) He reported that he had "considerable worry" and had mood swings when he was preoccupied or tired. (Id. at 403.) He was anxious and had difficulty sleeping. (Id.) He reported memory loss, but Dr. Reid attributed the cause to his anxiety. (Id.) His immediate, short-term memory and remote, long-term memory were both intact. (Id.) He denied homicidal or recent suicidal ideation. (Id.) He was alert and oriented to person, place, and time. (Id.) He reported that he got along well with family and friends. (Id. at 404.) Dr. Reid considered Plaintiff's concentration, persistence, and pace to be "slightly impaired." (Id.) In addition to diagnosing Plaintiff with major depressive disorder, recurrent, moderate, Dr. Reid opined that Plaintiff had generalized anxiety disorder. (Id.) His current GAF was 70.[18] (Id.) Dr. Reid also opined that Plaintiff would benefit from continued psychiatric care, including medication and psychotherapy. (Id. at 404-05.)

In April 2004, a Psychiatric Review Technique form ("PRTF") for Plaintiff was completed by Aine Kresheck, Ph.D. (Id. at 359-73.) Dr. Kresheck reported that Plaintiff had an affective disorder, i.e., major depressive disorder, and an anxiety-related disorder that resulted in mild restriction of his activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, and pace,

---

[18]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic Manual at 34.

and one or two repeated episodes of decompensation of any duration.  (<u>Id.</u> at 362, 364, 369.)

Dr. Kresheck also completed a Mental Residual Functional Capacity Assessment ("MRFCA") of Plaintiff.  (<u>Id.</u> at 374-77.)  Of twenty listed mental activities, Plaintiff was rated as "moderately limited" in four:  his "ability to understand and remember detailed instructions"; his "ability to carry out detailed instructions"; his "ability to maintain attention and concentration for extended periods"; and his "ability to respond appropriately to changes in the work setting."  (<u>Id.</u> at 374-75.)  Either he was not significantly limited in the remaining categories or there was no evidence of any limitation in those categories.  (<u>Id.</u>)

The following month, Plaintiff underwent a consultative physical examination by Elbert H. Cason, M.D.  (<u>Id.</u> at 394-400.)  Dr. Cason listed Plaintiff's impairments as kidney disease, hypertension, and headaches.  (<u>Id.</u> at 394.)  Plaintiff reported that his kidneys were working at 35 to 40%, his headaches occurred a couple of times a week and lasted for a couple of hours, and his blood pressure was, that day, fine.  (<u>Id.</u>)  He went outside every day and walks "a lot."  (<u>Id.</u>)  He could walk several miles.  (<u>Id.</u>)  He went shopping and drove his car.  (<u>Id.</u>)  On examination, he had a normal range of motion in his back.  (<u>Id.</u> at 395.)  Straight leg raises were negative.  (<u>Id.</u>)  He could heel and toe stand and squat.  (<u>Id.</u> at 396.)  His gait and station were normal without the use of any assistive devices.  (<u>Id.</u>)  The strength in the major muscle groups in his upper and lower extremities was normal, as were his grip strengths.  (<u>Id.</u>)  His fine motor manipulation was normal.  (<u>Id.</u>)  Dr. Cason found no evidence of any end organ damage which would limit his ability to perform normal functions.  (<u>Id.</u>)

The record also includes a "Case Analysis" dated in May 2004 by Dennis McGraw, D.O. (Id. at 406.) Dr. McGraw noted, inter alia, that Dr. Purcell's records consistently refer to Plaintiff as feeling okay, fine, or good. (Id.)

## The ALJ's Decision

Employing the Commissioner's five-step sequential evaluation framework , see pages 30 to 34, below, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since at least May 2004 and satisfied the disability earnings requirement through December 2005. (Id. at 16.) The ALJ next found that he had impairments of generalized anxiety disorder, major depression, and chronic kidney disease; however, these impairments were not of Listing-level severity. (Id. at 17.)

The ALJ then addressed the question whether these impairments precluded Plaintiff from performing his past relevant work or other work. He concluded at step four that Plaintiff could return to his past relevant work with a bottling facility. (Id. at 23.) He based this conclusion on inconsistencies he found in the record, including the following: (a) when Plaintiff was admitted to the hospital in June 2000 there were no criteria for a psychiatric admission; (b) the repeated references in Dr. Purcell's notes from June 200 to January 2004 that Plaintiff felt okay, fine, or well; (c) the inconsistency between Dr. Purcell's letter that Plaintiff suffered from fatigue and the lack of reference to such in his treatment notes; (d) his reported lack of physical problems and his ability to walk several miles daily; (e) his lack of attendance at a scheduled outpatient program in June 2000; (f) the inconsistency between his report of social isolation and his "regular and varied socially-oriented activities"; (g) the

inconsistency between (i) his report in April 2003 that lack of money was his main problem and (ii) his positive response to therapy and his allegations of disabling mental health symptoms lasting at least twelve months; (h) the references in Dr. Zia's notes to his non-compliance with medication and not wanting to take the medication; (i) the inconsistency in Dr. Garcia-Ferrer's report that Plaintiff suffered from disabling mental impairments and his contemporaneous treatment note indicating that Plaintiff was doing well; (j) his failure to seek regular psychiatric treatment and regularly take psychiatric medication; (h) his complaints of headaches and lack of pain medication for such; (i) the lack of regular treatment for his kidney disease; and (j) the lack of any medical evidence, as compared to letters submitted in support of his DIB application, of any mental or physical limitation placed on Plaintiff.  (Id. at 17-22.)

In addition to the inconsistencies cited above, when evaluating Plaintiff's subjective complaints, the ALJ also considered Plaintiff's report of having worked for a friend for six months in 2002 and his failure to report his earnings to the Internal Revenue Service as detracting from his credibility.  (Id. at 22-23.)  The ALJ concluded that Plaintiff's allegations of disabling symptoms were not fully credible.  (Id. at 24.)

Plaintiff was not, therefore, disabled within the meaning of the Act.  (Id.)

## **Legal Standards**

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B) (alteration added).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520. See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alterations added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on

h[is] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001) (alteration added).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e) (alterations added). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence,

however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent."). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

Additionally, the evaluation during the administrative review process of the severity of a mental impairment in adults must follow the technique set forth in 20 C.F.R. § 416.920a. This technique requires that the claimant's "pertinent symptoms, signs, and laboratory findings" be evaluated to determine whether the claimant has a medically determinable impairment. Id. § 416.920a(b)(1). The degree of functional limitation resulting from this impairment must then be rated. Id. §§ 416.920a(b)(2) and (c). This rating follows a specific format, identifying four broad functional areas and analyzing the degree of limitation in each area imposed by the mental impairment. Id. §§ 416.920a(c)(3) and (4). The degree of limitation in the first three areas is rated on a five-point scale: "[n]one, mild, moderate, marked, and extreme." Id. § 416.920a(c)(4). The degree of limitation in the fourth area, episodes of decompensation, is rated on a four-point scale: "[n]one, one or two, three, four or more." Id. A rating of "none" or "mild" in the first three categories and "none" in the fourth will generally result in a finding that the mental impairment at issue is not severe. Id. § 416.920a(d)(1). On the other hand, if the mental impairment is severe, the medical findings about that impairment and the resulting limitations in the four functional areas are to be compared "to the criteria for the appropriate listed mental disorder." Id. § 416.920a(d)(2). If the claimant has a severe mental impairment that does not meet or equal the severity of any listing, then the claimant's residual functional capacity is to be assessed. Id. § 416.920a(d)(3). Section 416.920a(e) requires that the application of this technique be documented. An ALJ is to document the application in his or her decision. Id.

The burden at step four remains with the claimant. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824. See also 20 C.F.R. § 404.1520(f). The Commissioner may meet his burden by eliciting testimony by a VE. **Pearsall**, 274 F.3d at 1219. If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case

differently," **Strongson**, 361 F.3d at 1070.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision."  **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

### Discussion

An adverse final decision by the Commissioner should be reversed and remanded where there are relevant "inaccuracies, incomplete analyses, and unresolved conflicts of evidence" in the ALJ's adopted decision.  **Draper v. Barnhart**, 425 F.3d 1127, 130 (8th Cir. 2005).  The Court finds such flaws, each originating in the ALJ's assessment of Plaintiff's mental impairments, in the decision at issue.

There are several relevant inaccuracies.  For example, the ALJ determined that Plaintiff's admission to the hospital in June 2000 weighed against his credibility because there were no criteria for a psychiatric admission.  The record reflects, however, that he was to be admitted to the psychiatric unit of the hospital based on his complaints of, inter alia, anxiety and depression, but was not due to concerns about insurance coverage.  Although he was admitted to the general medicine unit, he was examined and treated by a psychiatrist when hospitalized.  Moreover, three days after his discharged, he was admitted to a psychiatric unit in another hospital.  Another inconsistency cited by the ALJ, and noted by Dr. McGraw, is an apparent conflict between Plaintiff's complaints of continuing depression and his reports to Dr. Purcell that he was feeling, okay, fine, or well.  Dr. Purcell treated Plaintiff's Wegener's disease.  Dr. Zia treated him for depression.  Plaintiff saw both during

the same approximate time period. Reports to Dr. Purcell of feeling fine are often followed by reports to Dr. Zia of feeling depressed. It is clear from the record that Plaintiff had periodic episodes of depression between 2000 and 2004. Dr. Purcell's notations do not negate those occurrences and are not inconsistent with his complaints of depression.

Further, Dr. Purcell's notes are not devoid of any references to Plaintiff being fatigued or tired, contrary to the finding of the ALJ when concluding that Dr. Purcell's notation that Plaintiff suffered from fatigue was inconsistent with his treatment notes. Dr. Purcell noted at least three times that Plaintiff was tired. And, there are records from Dr. Zia generated approximately at the same time as records from Dr. Purcell that note Plaintiff's complaints of being tired. The ALJ failed to develop the record whether any apparent inconsistency in Plaintiff's complaints of fatigue might be explained by the type of doctor to whom he was making the complaints.

There are also incomplete analyses in the ALJ's decision. For instance, the ALJ cited an apparent inconsistency between Plaintiff's report of social isolation and his "regular and varied socially-oriented activities." The record reflects that, at times, Plaintiff did engage in social activities. He dated and traveled. At other times, he was a social recluse. This isolation was confirmed by his son and his sister. Plaintiff's diagnosis of major depression, recurrent, see note 7, supra, is consistent with periods of social activity alternating with periods of social isolation. The ALJ erred by assuming the alternation was inconsistent with depression. Also consistent with Plaintiff's diagnosis of major depression, recurrent, is his report in April 2003 that lack of money was his main problem and his allegations of disabling

mental impairments lasting at least twelve months. The record reflects that finances were a consistent source of concern for Plaintiff, beginning with his then-wife's draining of the marital accounts and continuing to him selling his house and declaring bankruptcy. The record also reflects that Plaintiff divorced his wife, moved to a condominium, and was reassured – after the comment cited by the ALJ – by his son that his finances were not as bad as thought. Still, Plaintiff had periods of depression. Dr. Garcia-Ferrer's seemingly contradictory report that Plaintiff suffered from disabling mental impairments and his contemporaneous note that he was doing well is also consistent with a diagnosis of recurrent major depression.

In his decision, the ALJ determined that Plaintiff suffered from major depression. He did not specify whether the depression was recurrent or single episode. The only time Plaintiff was diagnosed with single episode depression was by Dr. Sky at his first hospitalization. The depressive episodes were repeated, clearly leading to the consistent diagnoses of "recurrent."

Additionally, the ALJ cited Plaintiff's lack of attendance at an outpatient program in June 2000 as detracting from the credibility of his complaints about a psychological impairment. Plaintiff was admitted to the hospital on June 5 and discharged on June 7. On June 10, he was admitted to the psychiatric unit of another hospital. He was discharged on June 17. He was to start a day program on June 19, but did not. (R. at 205.) On June 20, Plaintiff informed Dr. Purcell that he would soon start a day program with Dr. Zia. Dr. Purcell noted in his record of that day that Plaintiff appeared depressed. On June 21, he was

again admitted to the hospital. The record consistently reflects that Plaintiff lacked the motivation to do anything when he was depressed, and Dr. Purcell opined that he appeared to be so the day after he was to start the program. The ALJ, however, did not inquire of Plaintiff why he did not attend the program for the two days. The record further reflects that, at times, Plaintiff did participate in day programs, without lasting success. The evidence does not support the ALJ's conclusion that Plaintiff's unexplained absence from a program in 2000 detracted from his credibility.

The ALJ also failed to resolve the conflict between the assessment of Dr. Reid, the consulting examiner, after a 30-minute session, see Record at 401, that Plaintiff had moderate recurrent major depression and his assessment of Plaintiff as having a GAF that reflected mild symptoms. Moderate is between mild and severe. <u>Diagnostic Manual</u> at 413. Plaintiff's treating psychiatrist, Dr. Zia, diagnosed his depression as severe. "'It is the ALJ's function to resolve conflicts among the various treating and examining physicians.'" **<u>Vandenboom v. Barnhart</u>**, 421 F.3d 745, 749-50 (8th Cir. 2005) (quoting <u>Estes v. Barnhart</u>, 275 F.3d 722, 725 (8th Cir. 2002)). "[T]he more consistent an opinion is with the record as a whole, the more weight . . . will [be] give[n] that opinion." 20 C.F.R. § 404.1527(d)(4) (alterations added). The ALJ failed to resolve the (a) internal conflict in Dr. Reid's report between diagnosing Plaintiff with moderate depression and assessing a GAF with mild symptoms and (b) the external conflict between Dr. Reid's diagnosis of moderate depression and Dr. Zia's diagnosis of severe depression. <u>Cf.</u> **<u>Hudson ex rel. Jones v. Barnhart</u>**, 345 F.3d 661, 666-67 (8th Cir. 2003) (noting that ALJ in "well-drafted"

decision had done "precisely what an ALJ is instructed to do" by analyzing whether GAF ratings accurately reflected child's current abilities and by analyzing various conflicts and inconsistencies in record).

Because the ALJ inaccurately and incompletely assessed Plaintiff's mental impairment, the case should be remanded for a reevaluation of such and of Plaintiff's credibility. <u>See</u> **Reed v. Barnhart**, 399 F.3d 917, 923-24 (8th Cir. 2005) (remanding for further proceedings case in which ALJ improperly discounted effect of claimant's mental impairments, including anxiety, depression, and PTSD, on her ability to perform routine and simple daily living activities); **Garrett ex rel. Moore v. Barnhart**, 366 F.3d 643, 653-54 (8th Cir. 2004) (remanding case for further evaluation of limitations on claimant's functioning caused by his recurrent major depression and noting that when claimant was not experiencing an episodic bout of depression he was cable of functioning at a higher level than when he was); **Reeder v. Apfel**, 214 F.3d 984, 988 (8th Cir. 2000) (finding ALJ's deficiency in opinion-writing required reversal where opinion did not, inter alia, discuss exertional limitations or several diagnoses and such omissions had practical effect on outcome of case).

## Conclusion

For the foregoing reasons, the undersigned finds that the ALJ's decision is not supported by substantial evidence in the record as a whole and must be reversed and remanded for further proceedings. Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be REVERSED and that this case be REMANDED for further proceedings as set forth above.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.  See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of July, 2007.